1
2
3
4
5
6
7
8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

11   PIONEER MILITARY LENDING, INC.;
     and PIONEER MILITARY LENDING
12   OF NEVADA, INC.,
                                            NO. CIV. S-06-1445 LKK/PAN
13
             Plaintiffs,
14                                              O R D E R
         v.
15
     PRESTON DUFAUCHARD, Commissioner,
16   Department of Corporation, State
     of California,
17
             Defendant.
18   _____/

19       On June 28, 2006, plaintiffs, Pioneer Military Lending, Inc.

20   ("Pioneer") and Pioneer Military Lending of Nevada, Inc. ("PLC-

21   Nevada") filed suit against defendant, Preston DuFauchard, in his

22   official capacity as Commissioner of the California Department of

23   Corporations.  Plaintiffs are in the business of providing consumer

24   loans to United States military personnel.  Compl. at 2, 12.

25   Plaintiffs allege that defendant's attempts to regulate its

26   business "constitute[] an undue burden on interstate commerce,"

                                    1

violate the Fifth and Fourteenth Amendments of the United States Constitution, and their civil rights under 42 U.S.C. § 1988. Compl. at 12.  Both plaintiffs seek an injunction prohibiting defendant from requiring them to become licensed, from initiating litigation against them, from attempting to regulate their loan business, and an award of attorneys' fees.  Id.  Pending before the court is plaintiffs' motion for a preliminary injunction.[1]  The court decides the matter based on the pleadings, the papers filed herein, and after oral argument.[2]

## I.

### STANDARDS FOR ISSUING A PRELIMINARY INJUNCTION

The standards for a temporary restraining order and for a preliminary injunction are substantially the same.  Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001).  The Ninth Circuit's longstanding standard for a preliminary injunction is well known: the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions

---

[1]  On July 3, 2006, Judge William B. Shubb granted plaintiffs' motion for a temporary restraining order ("TRO") and scheduled a hearing on the motion for a preliminary injunction for July 13, 2006 before the undersigned.  On July 11, 2006, this court extended the TRO until July 23, 2006 at 10:00 a.m. (or until the court issued its order on the motion for preliminary injunction, whichever occurred first).  The court continued the preliminary injunction hearing to July 20, 2006 at 2:00 p.m.

[2]  Plaintiffs initially requested that the court allow them to present approximately four (4) hours of testimony. On July 11, 2006, plaintiffs rescinded their request to present oral testimony and stated that they would reduce all testimony to declarations and other written evidence.

2

1   are raised and the balance of hardships tips sharply in favor of

2   the moving party.  Dr. Seuss Enters. v. Penguin Books USA, Inc.,

3   109 F.3d 1394, 1397 n. 1 (9th Cir. 1997).  These standards "are not

4   separate tests but the outer reaches of a single continuum."

5   Int'l Jensen, Inc. v. Metrosound U.S.A., 4 F.3d 819, 822 (9th Cir.

6   1993)(citation omitted).  "In cases where the public interest is

7   involved, the district court must also examine whether the public

8   interest favors the plaintiff." Fund for Animals, Inc. v. Lujan,

9   962 F.2d 1391, 1400 (9th Cir. 1992)(citing Caribbean Marine Servs.,

10  Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988)).

11      The court in any situation must find that there is at least

12  a fair chance of success on the merits, see Johnson v. California

13  State Bd. of Accountancy, 72 F.3d 1427, 1430 (9th Cir. 1995), and

14  that there is some threat of an immediate irreparable injury.  See

15  Big County Foods, Inc. v. Board of Ed. of the Anchorage School

16  Dist., 868 F.2d 1085, 1088 (9th Cir. 1989).  Furthermore, "[t]he

17  issuance of an ex parte temporary restraining order is an emergency

18  procedure, and is appropriate only when the applicant is in need

19  of immediate relief." Wright, Miller & Kane, Federal Practice and

20  Procedure: Civil 2d § 2951 at 256-57 (footnote omitted).

21  ////

22  ////

23  ////

24  ////

25  ////

26  ////

## II.

### FACTUAL BACKGROUND[3]

**A.   PIONEER MILITARY LENDING, INC. ("PIONEER")**

Pioneer is a Washington corporation, whose corporate headquarters is located in Tacoma, Washington.  It is in the business of making loans exclusively to United States military personnel.  Pioneer makes loans to military personnel stationed in California who are not state residents pursuant to their Leave and Earnings Statement ("LES").[4]  Pioneer and its sister corporations approved roughly 50,000 loans within the last year, all to military borrowers, out of approximately 100,000 applications.

### 1.   Pioneer's Readi-Loan Program

Pioneer meets the needs of military personnel through its Readi-Loan Program.  At military bases where a significant number of military personnel are stationed, the potential borrower responds to the Pioneer loan advertisements by mailing, calling or

---

[3]   The following facts are derived from plaintiff's pleadings and the evidence tendered by the parties.   Although the parties did not stipulate to the facts, defendants do not appear to dispute plaintiffs' version of the facts.  If defendants did indeed dispute plaintiffs' facts and evidence, they certainly did not indicate so in their papers or during oral argument.

[4]   Plaintiffs explain that they determine legal residency as follows:  Upon entry into military service, a solider must file Department of Defense Form Number 2058, the State of Legal Residence Certificate, and declare the state of his or her legal residence.  No change in a soldier's legal residence occurs thereafter as a result of his or her having been ordered to a new duty station.  All soldiers receive a "Leave and Earning Statement."  The Declaration of State of Residence is then recorded on each soldier's Leave and Earnings Statement ("LES"), which is the soldier's pay statement (comparable to an employee's pay stub.)

1   visiting an agency office located near the military base.   The

2   agency is a retail company with which Pioneer has contracted to

3   assist Pioneer in the application process ("Agency").   This agency

4   will obtain a copy of the potential military borrower's military

5   LES and/or military identification information, accept

6   applications, and then refer qualified loan applications via

7   computer/fax to Pioneer in Washington.

8       Pioneer requires the Agency to review the potential borrower's

9   LES to determine the state of residence of the potential borrower,

10  and decline to accept or forward to Pioneer any application from

11  a resident (per the LES) of the state in which that Agency office

12  is located.   Pioneer will not accept a loan application from a

13  potential military borrower located in California if the LES of

14  that potential borrower reflects that the borrower is a resident

15  of California.

16      Pioneer approves or disapproves all loan applications in its

17  Washington office, and the Agency plays no role whatsoever in this

18  loan decision process.   Loan forms are forwarded to each potential

19  borrower only at the direction of Pioneer's personnel in

20  Washington.   The loan documents that form the contract between

21  Pioneer and its military borrower specifically provide that the

22  laws of the State of Washington govern the loan transaction.

23      If Pioneer approves the loan application, then Pioneer's

24  Washington office disburses the funds directly to the military

25  borrower.   The loan documents provide that loan repayments are made

26  either directly to the Washington office of Pioneer by the military

1  borrower, or the potential borrower may choose to have his loan

2  payment taken directly from his pay or bank account by military

3  allotment of electronic funds transfer authorization and credited

4  to Pioneer in Washington.

5      **2.  Prior Litigation**

6      In 1990, Pioneer filed suit in the United States District

7  Court for the Western District of Missouri, against the

8  Commissioner of the Missouri Division of Finance, <u>Pioneer Military

9  Lending, Inc. v. Earl Manning, Commissioner</u>, No. 90-0728-CV-W-8

10  (hereinafter referred to as <u>Manning</u>), after receiving a "cease and

11  desist" demand from defendant, which sought to prevent Pioneer from

12  lending to non-resident military borrowers stationed in Missouri.

13  In <u>Manning</u>, Pioneer sought a declaratory judgment that its business

14  model, which provided loans solely to military borrowers who were

15  not residents of Missouri, was not subject to regulation by the

16  State of Missouri.

17      Defendant, the Commissioner of the Missouri Division of

18  Finance, attempted to require Pioneer to comply with all of the

19  statutory requirements established by a Missouri statute.  On June

20  18, 1992, the United States District Court for the Western District

21  of Missouri entered a Memorandum Opinion which stated that

22  ". . . defendant's attempted regulation of plaintiff's business is

23  an undue burden upon interstate commerce under the balancing test

24  set forth in Pike, and, therefore is a violation of the United

25  States Constitution, Art. III, § 8, cl. 3."  First Freeman Decl.

26  at 27, Ex. A.  That Memorandum Opinion denied Pioneer's claim for

1 a violation of its civil rights, which had been brought under 42

2 U.S.C. § 1983.  Id.  On June 19, 1992, judgment was entered for

3 plaintiff Pioneer Military Lending, Inc.  First Freeman Decl. at

4 28, Ex. B.  The case was appealed to the Eighth Circuit Court of

5 Appeals.

6      On August 11, 1993, the Eighth Circuit Court of Appeals

7 affirmed the district court's decision that the attempted

8 regulation by the State of Missouri violated the Commerce Clause

9 and reversed the judgment of dismissal of Pioneer's civil rights

10 claim and remanded for further proceedings.  Pioneer Military

11 Lending v. Manning, 2 F.3d 280 (8th Cir. 1993).  After the Manning

12 litigation, Pioneer created sister corporations to serve military

13 borrowers during normal business hours in all time zones in the

14 United States.  Pioneer Military Lending of Washington, Inc., was

15 created to service the Western Time Zone.  In late 2005, that

16 company was merged into plaintiff, Pioneer Military Lending, Inc.

17 Plaintiff continues to operate in the same fashion as described in

18 Manning.[5]  Pioneer has made slightly over four (4) loans per day

19 over the last six (6) years to non-resident military borrowers who

20 applied for loans from its agency office in Oceanside, California.

21 ////

22 ////

---

23

24      [5]  Plaintiff maintains that in the thirteen years since
Manning was decided in 1993, more than 25 states have recognized
and accepted the rationale of the Manning decision, and allowed
25 Pioneer to operate its Readi-Loan program for loans to military
borrowers stationed in that state who are not residents of that
26 state.  Compl. at 7-8.

**3.   <u>Events Leading Up To Defendant's Actions (1995-2005)</u>**

In 1995, Pioneer began to correspond with the predecessor of defendant, the then-Commissioner of the California Department of Corporations ("Department"), concerning the Readi-Loan program. Following a lengthy exchange of correspondence, on March 25, 1996, the Commissioner of Corporations issued a Specific Ruling. Specific Ruling OP 6547 stated:

> In Pioneer's case, no loans will be made to California residents.   Since only active duty, non-resident personnel stationed at facilities located in California will be eligible for loans under Pioneer's plan of business, it is difficult to discern what the interest is of the State of California so as to require licensure of Pioneer under the law.

First Freeman Decl. at 37 and Ex. E.   The Specific Ruling concluded that, based on the unique facts of Pioneer's "Readi-Loan" lending program, Pioneer was not engaging in the business of a finance lender in the State of California when it made loans to active duty, non-resident military borrowers, stationed at military facilities in California, and did not need to become licensed under the California Finance Lenders Law.   <u>Id</u>. at 3.

Pioneer wrote a letter to the Department dated May 13, 2005, which pointed out, <u>inter alia</u>, that Pioneer had received 13,624 applications from its Oceanside referral agency and that of those applications, 6,797 had become actual loans.   Further, of those 6,797 loans, not one had been made to a resident of California per the borrowers' LES.   First Freeman Decl. at  40, Ex. F.   This letter stated:

////

> In summary, since the specific ruling of March 25, 1996 was made by the Department, the only change in the Readi-Loan program from the model approved by Manning and by the Department is that a Washington company (and not a Nebraska company) runs the Readi-Loan program in the Pacific Time Zone. All other aspects of the business are maintained and operated in strict accord with Manning and the Department's ruling of March 25, 1996.

Id. Pioneer claims it has continued to operate its Readi-Loan program within the terms and conditions of the Specific Ruling from 2000 to date.

**4.   Withdrawal and Rescission Of The Specific Ruling**

On May 19, 2006, defendant withdrew and rescinded the Specific Ruling. First Freeman Decl. at 42, Ex. G. The Rescission Order, Release No. 57-FS, states that it will " . . . become effective on and after June 30, 2006 . . . ." The Rescission Order states that "[a]fter further review, the Commissioner has determined that there are other state interests that apply to military personnel, regardless of whether they are residents or non-residents of California . . . ."[6]   The Order concluded by stating that the

---

[6]   The Rescission Order stated that the state interests included the following:

1. To ensure an adequate supply of credit to borrowers in this state.
2. To simplify, clarify, and modernize the law governing loans made by finance lenders.
3. To foster competition among finance lenders.
4. To protect borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders.
5. To permit and encourage the development of fair and economically sound lending practices.
6. To encourage and foster a sound climate in this state.

1  Commissioner hereby withdraws from publication and rescinds

2  Specific Ruling OP 6547 CFLL, and that:

3      Existing law prohibits any person from engaging in the
       business of finance lender without obtaining a license,
4      and this requirement applies to loans made to military
       borrowers in California regardless of their state of
5      residency.

6  First Freeman Decl. at 42, Ex. G.

7      On June 14, 2006, Pioneer sent a letter to the Department

8  objecting to the issuance of the Rescission Order.  On June 26,

9  2006, the Department demanded that Pioneer notify the Department

10  "in writing by no later than the close of business on June 28,

11  2006, as to whether Pioneer is firmly committed to obtaining

12  licensure under the law, or whether Pioneer will cease all lending

13  activities in this state." Second Freeman Decl. at 17, Ex. A.

14     California law requires financial lenders to "obtain a license

15  from the commissioner." Cal. Fin. Code § 22100.  All licensees are

16  prohibited from charging interest rates that are higher than those

17  established in Cal. Fin. Code § 22303.[7]  The law provides that a

18  _____

19         [7]  Cal. Fin. Code § 22303, "Maximum rate of charges,"
    provides:

20      Every licensee who lends any sum of money may contract
       for and receive charges at a rate not exceeding the sum
21      of the following:
       (a) Two and one-half percent per month on that part of
22      the unpaid principal balance of any loan up to,
       including, but not in excess of two hundred twenty-five
23      dollars ($225).
       (b) Two percent per month on that portion of the unpaid
24      principal balance in excess of two hundred twenty-five
       dollars ($225) up to, including, but not in excess of
25      nine hundred dollars ($900).
       (c) One and one-half percent per month on that part of
26      the unpaid principal balance in excess of nine hundred

1  licensee may be located outside of California "if the licensee

2  agrees in writing in the license application to do, at the option

3  of the applicant, one of the following:

> (1) Make the licensee's books, accounts, papers, records, and files available to the commissioner or the commissioner's representatives in this state.
>
> (2) Pay the reasonable expenses for travel, meals, and lodging of the commissioner or the commissioner's representatives incurred during any investigation or examination made at the licensee's location outside this state.[8]

9  See Cal. Fin. Code § 22106(b).

10 **B.   PIONEER MILITARY LENDING OF NEVADA, INC.**

11      The second plaintiff, Pioneer Military Lending of Nevada,

12 Inc., ("PML-Nevada"), is a Nevada corporation, which has only one

13 office and is located in Las Vegas, Nevada.  PML-Nevada has more

14 than sixty (60) employees involved in all aspects of the lending

15 process at that office.  PML-Nevada currently has no employees at

16 any other location.

17      PML-Nevada's business model is distinguishable from Pioneer's

18 business model.  Although PML-Nevada makes loans only to military

---

> dollars ($900) up to, including, but not in excess of one thousand six hundred fifty dollars ($1,650).
> (d) One percent per month on any remainder of such unpaid balance in excess of one thousand six hundred fifty dollars ($1,650).
> This section does not apply to any loan of a bona fide principal amount of two thousand five hundred dollars ($2,500) or more as determined in accordance with Section 22251.

[8]  A licensee located outside this state is not required to maintain books and records regarding licensed loans separate from those for other loans if the licensed loans can be readily identified.  See Cal. Fin. Code § 22106(b).

1   borrowers, it does so exclusively through the internet.  PML-Nevada

2   claims that all such loans are made by internet to military

3   borrowers whose physical location "is unknown at the time of the

4   loan."  Defendant, however, asserts that Nevada law requires PML-

5   Nevada to put the borrower's address on the loan documents and that

6   the application process requires a potential borrower to supply

7   his/her address, in addition to the LES which identifies the

8   borrower's residence.[9]  Opp'n at 11.

9       The borrower agrees that all loans are governed by Nevada law.

10  PML-Nevada is licensed in, and regulated by the Nevada Division of

11  Financial Institutions.  The loans are all subject to audit by the

12  regulatory agency.  PML-Nevada began internet lending operations

13  in June 1997 to offer worldwide lending activities exclusively to

14  military families.

15      Potential internet borrowers may learn about the PML-Nevada

16  website from any number of search engines, referring websites,

17  advertisements, or customer referrals.  Users may access the

18  PML-Nevada website from millions of locations across the globe.

19  ////

20  ////

21

---

22      [9]  See Gooding Decl., Ex. E.  The court has confirmed that
    PML-Nevada's website requires a borrower to complete an
23  application, which states in relevant part:  "You will need to
    supply your name, address, unit, etc. as well as information about
24  monthly housing costs, child support, and other expenses as
    applicable.  We will need a copy of your LES, and the front and
25  back of your military ID to complete the application review
    process."  See https://www.pioneermilitaryloans.com/PMLcom/
26  beginLoanApplication.do (viewed on July 16, 2006).

1  PML-Nevada maintains that because it is virtually impossible to
2  ascertain where an applicant is located when the applicant contacts
3  PML-Nevada through the Internet, PML-Nevada cannot confirm the
4  specific location of a potential military borrower when they apply
5  for a loan; when they supply additional information; when they use
6  on-line chat services; when they review loan options; when they
7  confirm their intent to accept a loan; or when they request
8  specific disclosures or electronic deposit of loan proceeds into
9  their bank of record.

10      All applications for loans to PML-Nevada are submitted by
11  internet transmission.  Those loan applications are directed to
12  PML-Nevada in Nevada.  All reviews and analyses of those
13  applications are performed by PML-Nevada employees in Nevada.  All
14  loan decisions are made by PML-Nevada employees in Nevada.  All
15  loan documents and necessary federal and state disclosure forms are
16  prepared by PML-Nevada in Nevada, and forwarded through the
17  internet to the applicant by PML-Nevada employees from Nevada.

18      Upon completion of the loan documents, and the receipt thereof
19  in Nevada, PML-Nevada disburses all loan proceeds from Nevada.  All
20  loans contain multiple statements to the applicant that the
21  applicant is choosing Nevada law as applicable.  All loan contracts
22  specifically state that Nevada law applies to the loan.  There are
23  multiple points during the process where the customer is made aware
24  of and chooses Nevada law.  All loan repayments are due to
25  PML-Nevada in Nevada.  All loans are subject to regulation, and
26  regular annual audit, by the Nevada Division of Financial

Institutions.

**1.   <u>Correspondences with Defendant</u>**

On May 17, 2005, PML-Nevada sent a letter to the Department

stating, in pertinent part:

> In your letter of April 21, 2005, you note that ". . .
> Pioneer's business may have changed since the Department's
> 1996 ruling," which approved Pioneer's Readi-Loan program.
> PML-Nevada is not making loans in the Readi-Loan program as
> defined in <u>Pioneer Military Lending, Inc. v. Manning</u>, 2 F.3d
> 280 (8th Cir. 1993) and approved by the Department.  Rather,
> PML-Nevada began Internet lending operations in June, 1997 to
> offer worldwide lending activities exclusively to military
> families.

Second Freeman Decl. at  20, Ex. B.

The letter also stated that:

> . . . there is no nexus between the State of California and
> the Internet loans that PML-Nevada offers via the Internet to
> these military borrowers who, as previously noted, relocate
> with great regularity and no predictability.  Coupled with
> the impossibility of determining where the borrower is
> actually located at the time of the loan and, the Interstate
> Commerce nature of these transactions, the interests of the
> State of California are de minimis at most.

Second Freeman Decl. at  20, Ex. 6.

In the response to PML-Nevada's letter, the Department stated:

> This responds to your letter of June 9, 2006 regarding
> Pioneer Military Lending of Nevada, Inc. and your letter of
> June 14, 2006 regarding Pioneer Military Lending, Inc.
> (hereinafter both referred to as "Pioneer") . . . Your
> correspondence to the Department of Corporations, including
> the two letters referenced above, disclose material changes
> in Pioneer's facts.  These changed facts include, but are not
> limited to, the operation of an additional internet-based
> lending operation by Pioneer . . . .

The Department explained that it believed that Cal. Fin. Code

§ 33750 may trump any remedy provided under Nevada or Washington

////

14

lending laws.[10]

Defendant also noted that:

> It is our understanding that Omni Loan Company Ltd. makes loans under a business plan that is based on Pioneer's business plan. In the recent case of *Brack v. Omni Loan Company*, the Superior Court found that "imposition of California law would not be an excessive burden on Omni per the Commerce Clause."

In conclusion, the June 26, 2006 letter stated that defendant was "confident the Commerce Clause will not provide a valid defense for Pioneer." Defendant demanded that plaintiffs notify the Department

> . . . in writing by no later than the close of business on June 28, 2006, as to whether Pioneer is firmly committed to obtaining licensure under the law, or whether Pioneer will cease all lending activities in this state.

Second Freeman Decl. at 17, Ex. A.

Plaintiffs maintain that the Department's threatened enforcement actions against them, if effected as promised, will result in immediate and irreparable injury, in the form of damage to their reputation and goodwill, the attachment of civil and possible criminal penalties, the effective closure of their business in the state of California, and interference in their ability to maintain their customer relationships. Mot. at 11.

---

[10]   Section 22750 provides in pertinent part:

> If any provision of this division is willfully violated in the making or collection of a loan, the contract of loan is void, and no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction.

1                                    **IV.**

2                                 **ANALYSIS**

3        Plaintiffs seek to enjoin the California Commissioner of

4   Corporations from enforcing the California Finance Lenders Law,

5   Cal. Fin. Code §§ 22001, et seq. ("CFLL") against plaintiffs and

6   from enforcing Commissioner's Release No. 57-FS issued on May 19,

7   2006, which rescinds Specific Ruling OP 6547-CFLL.  The issue in

8   this case is whether California's Finance Code and the Department's

9   Rescission Order is unconstitutional as applied to plaintiffs'

10  business plans under the Commerce Clause of the United States

11  Constitution.

12  **A.    THRESHOLD ISSUES**

13       Before turning to whether plaintiffs can demonstrate a

14  likelihood of success on the merits, the court turns to several

15  threshold issues raised by defendants.

16       First, defendant contends that plaintiffs must satisfy a

17  heightened burden because the injunction seeks "to stay

18  governmental action in the public interest pursuant to a statutory

19  or regulatory scheme."  Opp'n at 2 (citing Able v. United States,

20  44 F.3d 128, 130-31 (2d Cir. 1995)).  Defendant argues that

21  plaintiffs must show more than "sufficiently serious questions

22  going to the merits," and must instead demonstrate a likelihood of

23  success on the merits and irreparable harm.  Id.  Defendant is

24  mistaken.  The Ninth Circuit has explicitly stated that it has not

25  adopted the heightened preliminary injunction standard urged by

26  defendants.  See Rodde v. Bonta, 357 F.3d 988, 994, n. 8 (9th Cir.

1    2004)(Ninth Circuit has not adopted the heightened preliminary

2    injunction standard urged by the County to show a strong likelihood

3    of success on the merits rather than just simply raising serious

4    questions).   Thus, a preliminary injunction should be granted if

5    plaintiffs can show: (1) a combination of probable success on the

6    merits and the possibility of irreparable injury, *or* (2) that

7    serious questions are raised and the balance of hardships tips

8    sharply in favor of the moving party. <u>Dr. Seuss Enters. v. Penguin</u>

9    <u>Books USA, Inc.</u>, 109 F.3d 1394, 1397 n. 1 (9th Cir. 1997).

10        Defendant also maintains that plaintiffs' burden is greater

11   where the preliminary injunction sought may be the equivalent of

12   disposing of the entire action.   Opp'n at 3.   They cite to no

13   binding authority for this proposition, and the cases they do cite

14   are factually distinguishable.   For example, defendant relies on

15   <u>Romer v. Green Point Sav. Bank</u>, 27 F.3d 12, 16 (2d Cir. 1994),

16   where bank depositors sought injunctive relief to block a bank from

17   proceeding with a stock conversion plan.   The court found that

18   granting the temporary restraining order would have been tantamount

19   to a final injunction because the order would have made it

20   impossible for defendant to meet its 45-day sale date and would

21   have prevented the conversion plan from taking effect within the

22   time allowed by law.   Where, as here, the granting of a preliminary

23   injunction will not effectively grant plaintiffs final victory in

24   the matter, the court finds that applying a heightened burden cited

25   by defendants is wholly inappropriate.

26   ////

1    Finally, defendant argues that injunctive relief is
2    inappropriate when the rights of non-parties will be affected.
3    Defendant states that an injunction in this case would affect
4    California consumers and businesses without full argument of the
5    issues.   Opp'n at 5.   They cite Horwitz v. Southwest Forest
6    Industries, Inc., 604 F.Supp. 1130 (D. Nev. 1985), for this
7    proposition.   In Horwitz, the district court refused to grant a
8    single shareholder a preliminary injunction which would affect the
9    investing public who were not parties to this litigation.   This
10   case is inapposite to the matter at bar where plaintiffs seek a
11   narrow injunction which seeks to prevent the Commissioner of
12   Corporations from enforcing California's lending laws on
13   plaintiffs' specific business plans.   Such an injunction, if
14   granted, would not "disrupt the statutory schemes set forth in the
15   [California Finance Lending Law]" as maintained by defendant.

16   **B.   LIKELIHOOD OF SUCCESS ON THE MERITS**

17   Plaintiffs argue that defendant's regulation of their lending
18   programs impacts interstate commerce and violates the federal
19   Commerce Clause.   Because plaintiffs seek injunctive relief as to
20   two different lending programs, Pioneer and PML-Nevada, the court
21   considers each program separately below.

22   **1.   Pioneer Military Lending, Inc. ("Pioneer")**

23   Pioneer argues that it is likely to prevail on the merits
24   because the same facts were litigated by the same plaintiff against
25   a similar regulation in Pioneer Military Lending, Inc. v. Manning,
26   2 F.3d 280 (8th Cir. 1993).   Mot. at 12.   Pioneer argues that

1   "nothing has changed from the <u>Manning</u> scenario," and that Pioneer's

2   business model remains the same in that "it does not transact with

3   California residents."  Repl. at 9.  Pioneer urges the court to

4   follow <u>Manning</u> and conclude that there are insignificant state

5   interests involved compared to the great burden on interstate

6   commerce.  Repl. at 14.  As an initial matter, the court agrees

7   with Pioneer that, as the Eighth Circuit had determined in <u>Manning</u>,

8   the court must apply the balancing test set forth in <u>Pike v. Bruce</u>

9   <u>Church, Inc.</u>, 397 U.S. 137 (1970), to determine whether defendant's

10  attempt to regulate plaintiffs' lending programs violates the

11  Commerce Clause.

12      The Commerce Clause provides that "Congress shall have Power

13  . . . [t]o regulate Commerce . . . among the several States." U.S.

14  Const., Art. I, § 8, cl. 3.  The Supreme Court has adopted what

15  amounts to a two-tiered approach to analyzing state economic

16  regulation under the Commerce Clause.  When a state statute

17  directly regulates or discriminates against interstate commerce,

18  or when its effect is to favor in-state economic interests over

19  out-of-state interests, the Court has generally struck down the

20  statute without further inquiry.  <u>See</u>, <u>e.g.</u>, <u>Philadelphia v. New</u>

21  <u>Jersey</u>, 437 U.S. 617 (1978); <u>Shafer v. Farmers Grain Co.</u>, 268 U.S.

22  189 (1925); <u>Edgar v. MITE Corp.</u>, 457 U.S. 624 (1982)(plurality

23  opinion).  Where, as here, a statute is neutral on its face and has

24  indirect effects on interstate commerce, the Court has examined

25  whether the state's interest is legitimate and whether the burden

26  on interstate commerce clearly exceeds the local benefits.  <u>Pike</u>

1  v. Bruce Church, Inc., 397 U.S. 137 (1970).   The High Court has

2  recognized, however, that there is no clear line separating the

3  category of state regulation that is virtually per se invalid under

4  the Commerce Clause, and the category subject to the Pike v. Bruce

5  Church balancing approach.   In either situation, the critical

6  consideration is the overall effect of the statute on both local

7  and interstate activity.   See Raymond Motor Transportation, Inc.

8  v. Rice, 434 U.S. 429, 440-441 (1978).

9      Turning to the case at bar, even where Congress has not

10 exercised its authority under the Commerce Clause, it bars state

11 regulations which unduly burden interstate commerce.   Southern

12 Pacific Co. v. Arizona, 325 U.S. 761, 769 (1945).  A state statute

13 must be upheld if it "regulates evenhandedly to effectuate a

14 legitimate local public interest, and its effects on interstate

15 commerce are only incidental . . . unless the burden imposed on

16 such commerce is clearly excessive in relation to the putative

17 local benefits." Pike, 397 U.S. at 142 (citation omitted).  Thus,

18 whether a particular regulation imposes an undue burden on

19 interstate commerce is analyzed under a three-prong inquiry: (1)

20 whether the challenged regulation regulates even-handedly, with

21 only "incidental" effects on interstate commerce; (2) whether such

22 regulation serves a legitimate local interest, and if so; (3)

23 whether alternative means could promote the local purpose as well

24 without discriminating against interstate commerce.   Hughes v.

25 Oklahoma, 441 U.S. 322, 336 (1979).

26 ////

1    Pioneer asserts that the facts of the instant case are similar
2    or identical to those in Manning, and that the court must simply
3    analogize the facts of the case at bar with Manning and decide in
4    its favor.  Pioneer's argument is well-taken.  The court turns to
5    the burden placed on Pioneer if it were forced to comply with the
6    California laws at issue before turning to the state interests
7    asserted by defendant, and whether any alternative means could
8    promote the local interstate commerce.

9                    **a.   The Burden on Pioneer**

10   Similar to the court in Manning, the court finds that the
11   burden imposed by the California Financial Lending Laws ("CFLL")
12   applied to Pioneer's business is substantial in relation to the
13   putative interests.  The burden a state regulation places on a
14   single company can be excessive under the Commerce Clause.  Pike,
15   397 U.S. at 146.[11]

16   Relying on the analysis in Pike, the Eighth Circuit in Manning
17   held that the district court did not err in "considering the impact
18   that the Missouri loan laws would have on Pioneer in respect to its
19   interstate resources . . . ."  Manning, 2 F.3d at 283.  In Manning,

20   _____

21   [11]  In Pike, the Court held invalid an Arizona regulation that
     required Arizona growers to package their fruits within the state.
22   Plaintiff grew cantaloupes in Arizona and packaged their fruits in
     a California facility approximately 30 miles away.  It would have
23   cost approximately $200,000 to put a packaging facility in Arizona,
     as required by the Arizona statute at issue.  After considering the
24   state interest of the statute - of protecting and enhancing the
     reputation of growers within the state - and the burden of such a
25   statute on the company at issue, the court held that the Arizona
     statute imposed a "straightjacket . . . on the company with respect
26   to the allocation of its interstate resources."  397 U.S. at 146.

1    the district court found that the Missouri law which would require

2    Pioneer to establish a full-service office in the state, would cost

3    $89,100 initially to start up a full-service operation and

4    approximately $123,000 per year to maintain it.  Compared to the

5    $24,000 that Pioneer currently spent on operating its Missouri

6    office, the court found that "the volume of Pioneer's volume of

7    business in Missouri was not large enough to maintain a profitable

8    full-service office."[12]  Id. at 282.

9        As noted above, defendant, the California Commissioner of

10   Corporations, is responsible for licensing and regulating consumer

11   credit lenders in the state of California.  On June 30, 2006,

12   defendant advised plaintiffs that it would rescind its prior

13   specific ruling allowing plaintiff to operate its business without

14   becoming licensed under California lending laws.  On June 26, 2006,

15   defendant notified Pioneer that it must notify defendant whether

16   it "is firmly committed to obtaining licensure under the law, or

17   whether Pioneer will cease all lending activities in this state."

18   Second Freeman Decl. at ¶ 17, Ex. A.

19       Compliance with California law requires financial lenders to

20   "obtain [] a license from the commissioner."  Cal. Fin. Code

21   § 22100.  All licensees are prohibited from charging interest rates

22

23       [12]  The district court considered another alternative –
     whether Pioneer could satisfy the state's regulations by putting

24   on the payroll one loan officer familiar with Missouri's
     requirements and responsible for seeing that Missouri's

25   requirements were met.  The district court concluded that "even the
     addition of a single employee would have the practical effect of

26   closing Pioneer's operation in Missouri," and that this alternative
     was "unfeasible."  Manning, 2 F.3d at 282.

1  that are higher than those established in Cal. Fin. Code § 22303.

2  The law provides that a licensee may be located outside of

3  California "if the licensee agrees in writing in the license

4  application to do, at the option of the applicant, one of the

5  following:

> (1) Make the licensee's books, accounts, papers, records, and
> files available to the commissioner or the commissioner's
> representatives in this state.

> (2) Pay the reasonable expenses for travel, meals, and
> lodging of the commissioner or the commissioner's
> representatives incurred during any investigation or
> examination made at the licensee's location outside this
> state.

11  See Cal. Fin. Code § 22106(b).

12  Defendant, without acknowledging that the Pike test applies,

13  or citing any applicable law, argues that Pioneer "cannot complain

14  that it will have to incur the expenses of opening and maintaining

15  an office in California" since "Finance Code section 22106 provides

16  reasonable conditions for maintaining its only business location

17  outside the state."  Opp'n at 8.  Defendant claims that "the

18  presence of so many CFLL ["California Finance Lenders Law"]

19  licensees from out of state raises the strong inference that it is

20  economically feasible for an out of state lender to be licensed in

21  California as well as other states."  Id. at 7.  Defendant points

22  out that "[t]here appear to be dozens of such lenders who do not

23  claim an undue burden from California regulation."  Id. at 8.

24  ////

25  ////

26  ////

1    As of July 6, 2006, defendant states that there were 7107 CFLL

2    licenses.  Adams Decl. at 1-2.[13]  Of these 335 licenses, 106 of

3    them are headquartered out of the state, domiciled out of the

4    state, or otherwise maintain a presence out of the state, based on

5    the fact that they request departmental communication to be sent

6    to locations outside California.  Id. at 2.  In Oceanside,

7    California, where plaintiff's referral agency is based, there are

8    12 CFLL licensee locations and three of them appear to be

9    non-California corporations with principal places of business

10   outside California, including the following:  Beneficial

11   California, Inc., (a Delaware corporation with an Illinois

12   address); American General Financial Services, Inc. (a Delaware

13   corporation with an Indiana address); and 1st 2nd Mortgage Company

14   of N.J., Inc. (a New Jersey corporation with a New Jersey address).

15   Defendant asserts that near Travis Air Force Base, Fairfield, there

16   are 14 CFLL licensee locations.  Of these, 5 appear to be

17   non-California corporations with principal places of business

18   outside California.  Finally, defendant submits evidence that he

19   is aware that Omni Military Loans, Inc., a lender specializing in

20   military loans, has recently applied to the Department of

21   ////

22   ////

23   ────────────

24   [13]  Warren Adams ("Adams") is a Supervising Examiner of the
     Financial Services Division of the Department of Corporations.  The
     Department of Corporations administers the California Finance
25   Lenders Law ("CFLL") through the Financial Services Division.
     Adams has conducted numerous searches and compilations of CFLL
26   licensees near known military installations.  Adams Decl. at 1.

1 Corporations for licensure under the CFLL.[14]

2 Indeed, the court notes that the number of out-of-state
3 lenders who have become licensed under the CFLL creates the
4 inference that it is economically feasible to comply with the CFLL
5 and become licensed. Id. at 8. However, the court cannot conclude
6 based on the evidence supplied by defendant that such lenders are
7 similarly situated to plaintiff in size, assets, and that such
8 lenders conduct a volume of business comparable to Pioneer. Nor
9 can defendant show that these other lenders target the same niche
10 market - i.e., military borrowers - that Pioneer does. Regardless
11 of how many other lenders are able to comply with the CFLL, it
12 appears that forcing Pioneer to comply with the CFLL would most
13 likely cause it to close its business operations. It is important
14 to remember that under Pike, the court is tasked with determining
15 whether the state laws at issue burden Pioneer so much as to be
16 excessive under the Commerce Clause. Pike, 397 U.S. at 146.[15]

17 ////

18

_____

19     [14]   Defendant states that Omni's website advertises that it
20 has "offices and representatives at major military installations
across the United States . . . ."

21     [15]   In Pike, the Court held invalid an Arizona regulation that
22 required Arizona growers to package their fruits within the state.
Plaintiff grew cantaloupes in Arizona and packaged their fruits in
23 a California facility approximately 30 miles away.  It would have
cost approximately $200,000 to put a packaging facility in Arizona,
24 as required by the Arizona statute at issue.  After considering the
state interest of the statute - of protecting and enhancing the
25 reputation of growers within the state - and the burden of such a
statute on the company at issue, the court held that the Arizona
26 statute imposed a "straightjacket . . . on the company with respect
to the allocation of its interstate resources."  397 U.S. at 146.

1    Importantly, defendant does not contest the evidence tendered

2   by plaintiff evidencing the burdens associated with complying with

3   the CFLL.  Pioneer submits the twenty-four page declaration of Don

4   Coker, a finance industry expert.[16]  Unlike in <u>Manning</u>, where

5   compliance with Missouri law would require Pioneer to establish a

6   full-service office in the state, compliance with California law

7   allows a licensee to be located outside of California if the

8   licensee agrees in writing in the license application to either

9   make its books, accounts, and records available to defendant, or

10  to pay the reasonable expenses so the Commissioner may investigate

11  or examine relevant records at a location outside of the state.

12  <u>See</u> Cal. Fin. Code § 22106(b).

13    To obtain a license, however, plaintiff would still have to

14  comply with California law, which includes charging interest rates

15  that are no higher than those established in Cal. Fin. Code

16  § 22303. Even under a business plan where plaintiff was not

17  required to establish a full-service office in California,

18  plaintiff claims it would be financially impossible to continue its

19  business.  First, Pioneer explains that it conducts a small volume

20  of business in California under its "Readi-Loan" program, making

21  "slightly over four (4) loans per day over the last (6) years to

22  non-resident military borrowers" who applied for its loans from the

23  _____

24      [16]  The court has examined Coker's curriculum vitae and, at
    this stage in the litigation, is satisfied that he is qualified to
25  assess the costs and overall feasibility of various business
    models.  Notably, defendant does not object or take issue with
26  plaintiffs' evidence in their opposition brief.  Nor does defendant
    submit any independent evidence to contradict plaintiffs' evidence.

26

1   Oceanside, California agency office.  First Freeman Decl. at 9.

2   This is equivalent to approximately 1,000 loans per year.

3   Truncated Coker Decl. at 6.[17]  Pioneer's expert, Coker, looked

4   carefully at the option of Pioneer continuing to employ loan

5   officers at its home office in Washington, and continuing to allow

6   such officers to handle all lending decisions for loans referred

7   from California in that Washington office, but making sure that

8   such loans conform with California lending laws.  Coker Decl. at

9   3.

10      Under such a model, Coker estimated that additional "start up"

11  costs for such an operation would total approximately $324,174.[18]

12  _____

13      [17]  Plaintiffs submitted a full-length Coker declaration, and
    also a truncated version for the court's convenience.  Where the
14  court cites from the truncated declaration, it shall be noted as
    such.

15      [18]  Coker's estimate for start-up costs for the Tacoma,
    Washington Pioneer operation to make loans that comply with
16  California law breaks down as follow:

| Start-Up Costs: | Tacoma, Washington | Info Source: |
|---|---|---|
| $ 54,387 | Costs of Obtaining Employees (incl. travel) | My estimate with Pioneer input |
| $ 48,000 | Employee Relocation costs | Pioneer estimate |
| $ 60,550 | FF&E | Pioneer estimate |
| $ 28,000 | Computers & installation – add'l | My estimate with Pioneer input |
| $ 7,400 | Telephone system augmentation | My estimate with Pioneer input |
| $ 184 | Telephone, additional line install. | AT&T quote |
| $ 213 | Internet Connection and install. | AT&T quote |
| $ 50,950 | Software licenses & modifications | Pioneer estimate |
| $ 25,000 | Advertising, Sales Promo | My estimate |
| $ 3,000 | Office Supplies | My estimate |
| $ 5,000 | Accounting Fees | My estimate |
| $ 25, 000 | Legal Fees | Pioneer estimate |
| $7,500 | Consulting Fees & systems integr. | Pioneer Estimate |
| $380 | Chamber of Commerce membership | My estimate |
| $610 | BBB membership | BBB |

1  Coker Decl. at 4.  Coker explains that this model would require an

2  expensive augmentation to Pioneer's computer system to handle loans

3  under California law.  That is, every time there was a change to

4  California law, Pioneer's system would have to be modified.  At a

5  minimum, Coker estimated that the "up-front computer software cost"

6  would be approximately $50,950, and that additional on-going costs

7  of between $2,400 and $12,000 would be incurred.  Id. at 4.  Coker

8  also explains that there would be "additional on-going legal and

9  regulatory compliance expense for California laws, estimated at

10 $56,550 each year."[19]  Coker explains that Pioneer would "likely be

11 forced to hire additional employees who are experienced in

12 California law, or alternatively to train some of their own

13 personnel in California law and have them designated exclusively

14 as the employees . . . that handle California loans."  Id. at 5.

15 Adding such employees would cost $34,500 to $58,000 per person.[20]

16 _____

17 | $8,000 | Miscellaneous | My estimate |

18 | **$324,174** | **Total Start-Up Costs** | |

19 [19] Coker states that he understand that loans are referred to
   the Washington offices from Texas, Colorado, and California.  Coker

20 Decl. at 4.  He believes that if California were permitted to
   regulate loans made to non-resident borrowers in California, he

21 would expect Texas and Colorado to assert the same rights, which
   would "exacerbate the situation" for Pioneer.  Coker Decl. at 4.

22 [20] Coker also estimated that the on-going annual operating
   expenses required in order to operate a full-service lending office

23 in Washington which complied with the CFLL is approximately $639,
   848.  Coker Decl. at 5.

24    Unfortunately, plaintiffs fail to submit any information
   regarding what their current operating expenses are so that the

25 court can make a meaningful comparison with how much it would cost
   to comply with the CFLL.  In Manning, the court found that for

26 Pioneer to comply with the Missouri law, operation costs would

Plaintiff's expert explained that the significant added expense of complying with the CFLL, including the start-up cost of $324,174, is a "significant added expenses because there would have to be sufficient loan volume" to support such additional costs. Truncated Coker Decl. at 5.

According to Coker, in order to recover its start-up costs over three years, Pioneer would have to receive 3,269 loans from the overall estimated market of 32,560 Marine Corp personnel in the Oceanside, California area. Id. at 6. Coker explains that this is a 10% "penetration factor" – in other words, one in ten active duty military non-California resident personnel would have to initiate a loan with Pioneer for it to "break even." Id. at 8. Coker believes that the "breakeven-level 10% level would be impossible to achieve." Id. Coker explains that in his thirty-eight years' experience in banking, finance, and consulting, he has never observed a lending operation achieve a market penetration level "as high as 10%." Id. Rather, "[m]ore common market penetration figures are in the single digits or fractions of 1%." Id.

Based on the evidence tendered by the parties, the court concludes that Pioneer would incur significantly increased expenses in its Tacoma, Washington location if it were required to make

---

exceed $210,000. 2 F.3d at 282. The court noted that Pioneer's current Missouri office operates at an expense of less than $24,000 per year. Id. Nevertheless, the record before the court suggests that Pioneer would incur significant costs if it were forced to comply with the CFLL.

1  loans compliant with California law.

2          **b.  State Interests**

3          In addition to examining the burdens placed on plaintiff, the

4  courts in <u>Manning</u> and <u>Pike</u> examined the putative interests asserted

5  by defendant.  In the case at bar, defendant states that

6  "California has an important interest in regulating loans made in

7  this state."  The Commissioner cites to the "underlying purposes

8  and policies of the CFLL," which are set forth in Cal. Fin. Code

9  § 22001, as follows:

10          (1) To ensure an adequate supply of credit to borrowers in
           this state.
11
           (2) To simplify, clarify, and modernize the law governing
12          loans made by finance lenders.

13          (3) To foster competition among finance lenders.

14          (4) To protect borrowers against unfair practices by some
           lenders, having due regard for the interests of legitimate
15          and scrupulous lenders.

16          (5) To permit and encourage the development of fair and
           economically sound lending practices.
17
           (6) To encourage and foster a sound economic climate in this
18          state.

19          Defendant, unfortunately, fails to adequately address each

20  interest as it applies to Pioneer's business model.  The court

21  turns to the six interests identified by defendant:

22          **I.   To Ensure an Adequate Supply of Creditors in
              this State**
23

24          This interest favors Pioneer. Forcing Pioneer to become

25  licensed may cause it to cease lending to military borrowers

26  located in California.

1           **ii.   To Simplify, Clarify and Modernize the Law**

2     Defendant fails to discuss this interest.  The court, however,

3 cannot conclude that forcing all out-of-state lenders to comply

4 with the CFLL would "simplify, clarify, and modernize the law,"

5 especially if such compliance contravenes the Federal Constitution.

6         **iii.   To Foster Competition Among Finance Lenders**

7     The Commissioner explains that the fostering of competition

8 among finance lenders benefits borrower and consumers.  Opp'n at

9 7.  Defendant contends that it would "certainly be unfair to

10 . . . lenders for Pioneer to be exempted from the provisions of the

11 CFLL when its potential competitors are licensed."  Opp'n at 7.

12 Defendant points out that one of plaintiff's competitors, Omni

13 Military Loans, Inc., has recently filed for CFLL licensure, but

14 fails to provide evidence of this licensure.  <u>Id</u>.  Further, as the

15 Eighth Circuit noted in <u>Manning</u>, the record reflects that Pioneer

16 serves a "unique niche" of the loan market by providing loans to

17 military borrowers who "have little, or no, credit rating history,"

18 or those that "have poor credit ratings."[21]  First Freeman Decl. at

19 3.  The record also reflects that Pioneer partners with Franchise

20 Operations which provides financial education and debt awareness

21 for those who require assistance with debt management. Vickery

22 Decl. at 2-4.  In short, although defendant argues that it has an

23 interest in assuring that Pioneer is not given a competitive

24 _____

25     [21]  Pioneer maintains that of 50,000 approved loans within the last year (out of approximately 100,000), 40,000 had FICO scores

26 under 640, which were either "not prime" or "subprime."  First Freeman Decl. at 3.

business advantage, the evidence is slim on the record presented. Manning, 2 F.3d at 280.

### iv. Interests 4, 5, and 6: to Protect Borrowers Against Unfair Practices, to Permit and Encourage Sound Lending Practices, and to Encourage a Sound Economic Climate

As in Manning, where the Commissioner of Missouri argued that "Missouri has an interest in protecting its residents from usurious interest rates," 2 F.3d at 282, the Commissioner in the case at bar argues that "there is a growing concern in California regarding the protection of California's substantial military population." Opp'n at 8. The Commissioner argues that he has an interest in protecting borrowers against unfair lending practices, and to encourage sound lending practices, and a sound economic climate. Opp'n at 6-9. Defendant explains that since December 31, 2004, the Department of Corporations has been designated to regulate so-called "payday lenders" under the California Deferred Deposit Transaction Law ("CDDTL), Cal. Fin. Code § 23000.[22] Defendant contends that under Washington's Consumer Loan Act, "Pioneer's loans made to residents of other states are not subject to the Act." Opp'n at 6. Defendant argues that "[p]ioneer's loans made to all non-Washington residents under its Readi-Loan program would not be subject to the oversight of any regulator at all," and "an unregulated military lender is undesirable." Id.

---

[22] Defendant defines "payday lenders" as those who provide short-term loans and hold a borrower's check, to be deposited at an agreed time. Opp'n at 8.

32

1   First, the court cannot agree with defendant that Pioneer's

2   loans would not be subject "to the oversight of any regulator at

3   all."  Defendant extracts several sections out of context from the

4   Consumer Loan Act to argue that Pioneer's loans made to residents

5   of other states are not subject to the Act.  Opp'n at 6 (citing

6   §§ 31.04.025, 34.01.165).[23]  Defendant's argument, however, is

7   unavailing.  Pioneer states that it holds license # 520-CL-18114

8   as provided by the Department of Financial Institutions.  The court

9   has confirmed that Pioneer is indeed a licensee under the laws of

10  Washington.[24]  As plaintiffs point out, § 208-620-240 of Title 208

---

[23]   Section 31.04.025, states, in pertinent part:
Application of chapter.  Each loan made *to a resident of
this state* by a licensee is subject to the authority and
restrictions of this chapter . . . (emphasis supplied)

Section 34.01.165 provides, in pertinent part:

Director — Broad administrative discretion — Rule making
— Actions in superior court . . .  The director has the
power, and broad administrative discretion, to
administer and interpret this chapter to facilitate the
delivery of financial services to the *citizens of this
state* by loan companies subject to this chapter
(emphasis supplied).  Defendant argues that based on
these two sections the Director of Finance only has
authority to regulate the activities of lenders who
provide services to residents or citizens of the State
of Washington.

[24]   The court may take judicial notice of information
contained on the Department of Financial Institution's ("DFI")
website.  See Denius v. Dunlap, 330 F.3d 919, 926 (7th Cir. 2003)
(stating that court may take judicial notice of information at
government agency's website).  The DFI's website allows consumers
to search for various licensees on its website.  See
http://www.dfi.wa.gov/consumers/findcompany.htm (viewed on July 17,
2006).  The court has searched the DFI's website and has confirmed
that Pioneer holds license # 520-CL-18114 for its main office, and
is currently licensed.  The DFI website also indicates that Pioneer
holds two other licenses for its branch offices under license

1   of the Washington Administrative Code ("WAC"),[25] which is in a

2   question and answer format states as follows:

> WAC 208-620-240.  Once I am licensed, does the act apply to all loans I make or only those above twelve percent?
>
> All loans you make as a licensee are subject to the authority and restrictions of the act including the provisions relating to the calculation of the annual fee.

7   Pioneer has tendered sufficient evidence for the court to conclude

8   that it is a licensee under the Washington Consumer Loan Act, and

9   that its loan activities are regulated by the Washington DFI.

10       Secondly, although defendant has asserted state interests

11  having to do with protecting borrowers and promoting sound lending

12  practices, he fails to articulate what interest, if any, California

13  has in protecting non-California residents from the activities of

14  a lender regulated by another state.  See Manning, 2 F.3d at 284

15  (citing MITE Corp., 457 U.S. at 644 (state has no interest for

16  purposes of Commerce Clause in protecting non-residents under

17  securities laws)).  Furthermore, although defendant submits

18  evidence that the Department of Corporations has instituted a

19  program entitled Troops Against Predatory Scams ("TAPS") and that

20  the California legislature has signed legislation that supports and

21  strengthens California's commitment to military veterans, Def.'s

22  Exs. C, D, defendant has provided no evidence to support how

23

24  # 520-CL-18114-18115 and license # 520-CL-18114-22716.  Id.

25       [25]  Title 208 of the WAC sets forth relevant administrative
    code sections having to do with the Department of Financial
26  Institutions.

plaintiff's activities constitute unfair lending practices or hurt California's sound economic climate.  Nor does the evidence suggest how Pioneer's "Readi-Loan" program might circumvent California law or negatively impact its residents.

In sum, based on the record presented to the court, the burden the CFLL places on interstate commerce when applied to Pioneer's business operation is great compared to the slight local interests served by imposition of its regulatory and statutory scheme to Pioneer's loans to non-residents stationed in California.

Accordingly, at this point in the litigation, Pioneer is likely to succeed on the merits on its commerce clause claim.[26]  In sum, the court finds that defendant's attempted regulation of Pioneer's business is an undue burden on interstate commerce, and therefore, a violation of the United States Constitution, Art. III, § 8, Cl. 3.  Defendant is enjoined from enforcing Cal. Fin. Code §§ 22001, and Release No. 57-FS as to Pioneer.

**1.  Pioneer Military Lending of Nevada, Inc. ("PML-Nevada")**

Defendant also seeks to force PML-Nevada to comply with California lending laws.  PML-Nevada pointed out to defendant on May 17, 2005 that it was not "making loans in the Readi-Loan program as defined in Pioneer Military Lending, Inc. v. Manning,"

---

[26]  The third prong that courts usually consider in the Pike balancing test is whether alternative means could promote the local purpose as well without discriminating against interstate commerce. See Hughes v. Oklahoma, 441 U.S. 322, 336 (1979).  Here, the court has considered the alternative and less burdensome means for Pioneer to comply with the California laws, which is to keep its operations in Washington, but to comply with California lending laws and interest rates.

1  but that it "began Internet lending operations in June 1997 to
2  offer worldwide lending activities," Second Freeman Decl. at 20,
3  Ex. B.  Defendant acknowledged that plaintiff's business now
4  included "the operation of an additional internet-based lending
5  operation."  Second Freeman Decl. at 17, Ex. A.  Defendant,
6  however, treated both Pioneer and PML-Nevada as the same entity and
7  stated that it believed "the Commerce Clause will not provide a
8  valid defense . . . ."  <u>Id</u>. at 17, Ex. B.

9      Before turning to the legal issues raised at bar, it is useful
10  to briefly revisit the facts submitted by PML-Nevada as to its
11  lending program.  PML-Nevada is a Nevada corporation, which has
12  only one office and is located in Las Vegas, Nevada.  Although
13  PML-Nevada makes loans only to military borrowers, it does so
14  exclusively through the internet.  All such loans are agreed by the
15  borrower to be under Nevada law.  PML-Nevada is licensed in, and
16  regulated by the Nevada Division of Financial Institutions.
17  PML-Nevada began Internet lending operations in June 1997 to offer
18  worldwide lending activities exclusively to military families.

19      All applications for loans to PML-Nevada are submitted by
20  Internet transmission.  Those loan applications are directed to
21  PML-Nevada in Nevada.  All reviews and analyses of those
22  applications are performed by PML-Nevada employees in Nevada.  All
23  loan decisions are made by PML-Nevada employees in Nevada.  All
24  loan documents and necessary federal and state disclosure forms are
25  prepared by PML-Nevada in Nevada, and forwarded by Internet to the
26  applicant by PML-Nevada employees from Nevada.

1    Upon completion of the loan documents, and the receipt thereof

2  in Nevada, PML-Nevada disburses all loan proceeds from Nevada.  All

3  loans  contain  multiple  statements  to  the  applicant  that  the

4  applicant is choosing Nevada law as applicable.  All loan contracts

5  specifically state that Nevada law applies to the loan.  There are

6  multiple points during the process where the customer is made aware

7  of and chooses Nevada law.  All loan repayments are due to

8  PML-Nevada in Nevada.

9          **a.   Prohibition on "Extraterritorial Effects"**

10     PML-Nevada contends, _inter alia_, that defendant's intended

11  control  over  PML-Nevada's  lending  program  would  be  projected

12  outside  the  borders  of  California,  thus  violating  the  dormant

13  commerce clause under what has become known as the

14  "extraterritorial effects" test.  Repl. at 16.  The Supreme Court

15  has  explained  that  the  "Commerce  Clause  .  .  .  precludes  the

16  application of a state statute to commerce that takes place wholly

17  outside  the  State's  borders,  whether  or  not  the  commerce  has

18  effects  within  the  state."   MITE Corp., 457 U.S. at 624-643.[27]

19  ─────────────────────

20     [27]  Edgar v. MITE Corp. has been called "the fount of modern
extraterritoriality decisions."  Jack L. Goldsmith, Alan O. Sykes,
21  The Internet and the Dormant Commerce Clause, 110 YALE L.J. 785, 804
(2001).  MITE involved an Illinois anti-takeover law that placed
22  significant prior restraints on tender offers for companies that
either had 10% of their shareholders in Illinois, or for which two
of the following conditions were met: The corporation's
23  headquarters were in Illinois, it was incorporated in Illinois, or
10% of its capital and paid-in surplus were in Illinois.   The
24  plurality's extraterritoriality analysis emphasized that the
Illinois regulation did far more than necessary to protect Illinois
25  interests. It noted that the Illinois law prohibited transactions
"not only with stockholders living in Illinois, but also with those
26  living in other States and having no connection with Illinois."

1 "The critical inquiry is whether the practical effect of the

2 regulation is to control conduct beyond the boundaries of the

3 State."  Id. (citation omitted).[28]

4      PML-Nevada argues that the "defendant has no authority

5 whatsoever over transactions occurring wholly outside California's

6 borders, regardless of the residence of the borrower."  Id. at 17.

7 PML-Nevada maintains that because it is virtually impossible to

8 ascertain where an applicant is located when the applicant contacts

9 PML-Nevada through the Internet, PML-Nevada cannot confirm the

10 specific location of a potential military borrower when they apply

11 for a loan, when they supply additional information, when they use

12 on-line chat services, when they review loan options, when they

13 confirm their intent to accept a loan, or when they request

14 specific disclosures or electronic deposit of loan proceeds into

15 their bank of record.

16 _____

17 The plurality further noted that the act could even "regulate a
   tender offer which would not affect a single Illinois shareholder."

18 The plurality concluded that it was "therefore apparent that the
   Illinois statute . . . has a sweeping extraterritorial effect."

19 MITE can thus be interpreted as saying that an Illinois law with
   such a significant out-of-state burden on communications between

20 non-citizens was not justified by the meager benefits achieved in
   Illinois.

21      [28]  Scholars have explained that the balancing test for

22 neutral state legislation that burdens interstate commerce and the
   heightened scrutiny test for discriminatory state legislation form

23 the core of the dormant Commerce Clause jurisprudence.  However,
   the dormant Commerce Clause is also said to "prohibit certain state

24 laws that regulate extraterritorially . . . ."  Id., Goldsmith and
   Sykes at 789 (2001).  Unfortunately, "[t]he scope of the

25 extraterritoriality principle is unclear . . . ."  Id. at 790.
   Goldsmith and Sykes argue that "the extraterritoriality concern is

26 that states may not impose burdens on out-of-state actors that
   outweigh the in-state benefits . . . ."  Id. at 805.

1    PML-Nevada tenders evidence to the court strongly suggesting

2  that although it may be possible to identify where their borrowers

3  are located, such a process may not be practical or economically-

4  feasible.   PML-Nevada submits to the court a declaration from its

5  forensic expert, Carl Florez, a former FBI Special Agent and

6  instructor,[29] who observes that "geolocation" technology for

7  internet transactions may be derived from "IP databases."[30]   He

8  states that the accuracy level of a "state level" geolocation

9  investigation is approximately 80% to 99% accurate.[31]   Thus, it

[29]   Florez states that he is a computer forensic expert who
has testified in both civil and criminal matters concerning
Internet-related matters and that he has over 25 years of
experience in computer-related investigations, including 20 years
with the FBI.   Florez Decl. at 2.

[30]   Developing technologies allow webpage content providers to
determine the content of a receiver's geographical identity on the
basis of the Internet Protocol ("IP") address of the user's
computer.   Goldsmith and Sykes explain that:

> The algorithms determine the geographical identity of
> the content receiver by cross-comparing results from (1)
> a mapping of IP addresses in the content *811 receiver's
> header  with  IP  address  databases,  and  (2)  a  tracer
> analysis of the path of the Internet transmission, which
> is checked against a database of the nodes through which
> the transmission traveled and their geographic location.
> While  neither  method,  taken  alone,  is  sufficiently
> accurate,  redundant  cross-referencing  of  these  databases
> holds  the  promise  to  be  extraordinarily  accurate.  This
> software  can  be  installed  in  the  content  provider's
> webpage,  allowing  the  provider  to  tailor  content  to
> comply with differing regulations in each geographical
> unit.

See Goldsmith and Sykes, 110 YALE L.J. at 811.

[31]   The 20% or more inaccurate results occur because of
dynamic IP addressing, dial up log-ons, proxy servers, anonymizers,
large corporate, educational and military networks.   Florez Decl.
at 3.

appears that it is possible for PML-Nevada to utilize technology

to fairly and accurately locate their borrowers.   Florez also

explains, however, that the process of physically locating

individuals through IP geolocation may be time-intensive, sometimes

taking "several days of conducting IP databases searches and

numerous phone calls, and is made more difficult when military

users make tracing logons through large corporate or educational

IP addressing schemes."   Florez Decl. at 3.   He states that "[t]he

process to positively identify a users [sic] location can take up

to 8 hours or more to accomplish for a single user," and that the

"typical computer forensic expert charges $250 to $450 an hour to

perform such work."   Thus, "[t]he total cost to positively identify

a single user could cost up to $3,600."   Florez Decl. at 4.   In

essence, PML-Nevada argues that it is economically infeasible to

locate its borrowers with reliable certainty because its business

transacts through the internet.[32]

---

[32]   Indeed, the internet has become fertile ground for dormant commerce clause challenges to state laws that attempt to regulate the actions of businesses utilizing the internet.  Courts have faced two types of state internet regulations where dormant commerce clause challenges arise:  where there are statutes regulating pornographic communication with minors and antispam statutes.  See PSINet, Inc. v. Chapman, 362 F.3d 227, 239 (4th Cir. 2004); State v. Heckel, 93 P.3d 189 (Wash.App. 2004); American Libraries Ass'n v. Pataki, 969 F.Supp. 160 (S.D.N.Y. 1997).

The leading case, American Libraries Ass'n v. Pataki, concerned the validity of a New York statute that prohibited intentional use of the Internet "to initiate or engage" in communications "harmful to minors" that depict "actual or simulated nudity, sexual conduct or sado-masochistic abuse." The statute established defenses to prosecution for defendants who, among other things, (1) make a reasonable effort to ascertain the minor's true age; (2) make a reasonable effort to prevent minors from accessing proscribed materials, including "any method which is feasible under

40

1    If the court accepts PML-Nevada's argument that it cannot know

2  for certain where PML-Nevada's borrowers are located, the court

3  must also assume that PML-Nevada's borrowers may consist of those

4  who defendant has an interest in protecting and regulating (e.g.,

5  California residents who are within the confines of California ),

6  as well as those who have a more tenuous or no connection with the

7  interests of California (e.g., non-residents who are not in

8  California).  Repl. at 16-17.  Thus, according to PML-Nevada, the

9  imposition of California lending laws on PML-Nevada's business

10  would sweep in not only those California has an legitimate interest

11  in protecting, but also those who have little or no connection with

12  California. PML-Nevada argues that this type of overbroad

13

14  available technology"; (3) restrict minors' access by requiring use
of a verified credit card or adult personal identification number;
15  or (4) label content in a way that facilitates blocking or
screening. Violations of the statute are punishable by one to four
16  years of incarceration.
        In enjoining enforcement of the New York statute, the court
17  began with several claims about the architecture of the Internet.
The court first noted that information transmitted via the Internet
18  can appear simultaneously in every state. As a result, "[o]nce a
provider posts content on the Internet, it is available to all
19  other Internet users worldwide."  Second, "[i]nternet users have
no way to determine the characteristics of their audience that are
20  salient under the New York Act-- age and geographic location."  The
court acknowledged that credit card verification, content
21  filtering, and adult identification technologies can facilitate
some geographical and identity discrimination on the Internet, but
22  it maintained that the costs associated with these technologies
were "excessive" and that the technologies were imperfect in any
23  event.
        The case at bar is distinguishable from <u>Pataki</u> and other
24  similar internet cases because, whereas here, it is undisputed that
PML-Nevada is required to collect information on the residency of
25  its potential borrowers (pursuant to the LES), there is a
manageable and sensible way for the court to determine which
26  borrowers California arguably has an interest in protecting.

41

1  regulation raises questions as to whether there is a violation of

2  the Commerce Clause.   In <u>Mite Corp.</u>, the Supreme Court held that

3  an Illinois law which sought to regulate corporate takeovers and

4  acquisitions was violative of the Commerce Clause because it could

5  apply to those living in Illinois, but also with those living in

6  other states and having no connection with Illinois.   The Court

7  struck down the law because it "could be applied to regulate a

8  tender offer which would not affect a single Illinois shareholder"

9  and constitutes a "direct restraint on interstate commerce."   102

10  S.Ct. 2629.

11      PML-Nevada's problem, however, is that Nevada law requires it

12  to put the borrower's address on the loan documents and that the

13  application process requires a potential borrower to supply his/her

14  address, in addition to the LES which identifies the borrower's

15  residence.[33]   Defendant argues that because of Nevada laws which

16  require plaintiffs to put the borrower's address on the loan

17  documents, "PML-Nevada cannot feign ignorance of the borrower's

18  locale."   Opp'n at 11.   PML-Nevada responds that "[d]efendant

19  misses the point," and that the nature of military lending is such

20  that a borrower's home address, official address (per the LES

21  statement), and the *physical location at the time of the*

22  *transaction* are likely to be different.   Repl. at 17 (emphasis in

23

24      [33]   <u>See</u> Gooding Decl., Ex. E.   As noted previously, <u>see</u> <u>supra</u>
    n. 9, the court has confirmed that PML-Nevada's website requires
25  a borrower to complete an application which requires the potential
    borrower to provide a name and address, and a copy of the
26  borrower's LES, which provides the state of residency.

the original).  During oral argument, PML-Nevada's counsel emphasized that "the LES is not necessarily a clear indication of where the particular borrower or potential borrower may be at the time that the borrower communicates [with PML-Nevada]."  Reporter's Transcript ("RT") at 9.  He explained to the court that "as I understand the LES, it is the point of origin which the service person registers on.  It doesn't change as the service person moves."  RT at 11.

Plaintiff maintains that in order for the Department to have any interest in the transaction "a borrower must be a California resident *and* be physically located within the state at the time he closes the loan."  Id.  It contends that the uncertainty of the physical location "is the crux" of its Commerce Clause argument, noting the transient nature of military serviceman.  Id.  It appears to the court that plaintiff suggests no regulation is necessary for lending institutions such as PML-Nevada where internet transactions are involved.  This logic is unavailing because if plaintiffs rely "upon the LES in one instance [in determining residency for Pioneer loans], it cannot now denigrate its significance" in this instance.  Indeed, it is inconsistent for plaintiff Pioneer to use the LES statement to make the argument that they are not lending to California residents, but to allow PML-Nevada to disavow the importance of the LES statement in order to allow it to avoid regulation by California.

When the court stated to counsel during oral argument that it was inclined to exclude from regulation "all those borrowers who

43

have LESes indicating that California is not their home," counsel
for PML-Nevada, Kurt Melchior, explained to the court that the LES
is only the "point of origin which the service person registers
on," providing the court with the following hypothetical:

> So if the service person comes from Sacramento and
> enlists here, and is immediately shipped to Ft. Lewis,
> Washington, and from Ft. Lewis, Washington, is assigned
> to, say, Okinawa, and that person gets on the Internet
> in Okinawa and says I would like to borrow $5,000, his
> LES is California but that person is outside California
> at all points relevant to the transaction.  So your
> Honor's decision would make a person outside California
> and a transaction wholly outside California subject to
> California regulation simply because at one point the
> individual had started from California."

RT at 11.

     That PML-Nevada would assert such an argument which strongly
suggests that "the LES isn't really in the long run the definition
of who is from California" is contradictory.  RT at 12.  As the
court stated to counsel, "that argument properly understood is one
against the initial decision that the court has made [in favor of
Pioneer]." Id.  Plaintiffs appear to suggest in a serious way that
they will accept the LES for residency purposes when it is in their
interest and deny its meaning when it is not.

     During oral argument, defendant's counsel stated that he
believed the most sensible way to determine which state law applies
to such lending programs is to apply the law of the state in which
the loan is made, especially given plaintiffs' counsel's argument
that the LES does necessarily indicate the service person's real
intention as to residency.  RT at 29.  As the court stated to the
parties during oral argument, while it is inclined to accept the

1  position of Pioneer in <u>Manning</u> and in this litigation, and to

2  utilize the LES as a reliable indicator of a service person's

3  intention as to residency, the court is also open, in the course

4  of this litigation, to accepting Mr. Melchior's position that the

5  LES is merely "the "point of origin which the service person

6  registers on."

7      Despite the contradictory position taken by plaintiffs in this

8  litigation as to the LES information supplied by potential

9  borrowers, the court finds that the only way to reconcile the

10 parties' various interests is to allow defendant to regulate any

11 borrower who indicates that his or her residency is California

12 pursuant to the his or her LES.  The court cannot accept PML-

13 Nevada's argument that geographic indeterminacy would make it

14 difficult for the court to say with certainty whether defendant's

15 attempted regulation would have "the practical effect" of

16 "control[ling] conduct beyond the boundaries of the state,"

17 especially when undisputed evidence shows that PML-Nevada requires

18 the potential borrower to provide his or her LES.  This solution

19 would allow the court to prevent defendant from "controlling

20 conduct beyond the boundaries of the state" in regulating PML-

21 Nevada's business, but to also recognize California's state

22 interests.[34]  <u>MITE Corp.</u>, 102 S.Ct. 2629.

23 ─────────────

24      [34] PML-Nevada argued during oral argument that allowing
California to regulate all borrowers who indicated on their LES
that they were California residents would subject it to

25 inconsistent regulations, which would violate the Commerce Clause.
The Supreme Court's Commerce Clause cases also have invalidated

26 statutes that may adversely affect interstate commerce by

1    In sum, the court GRANTS in part, and DENIES in part, PML-
2  Nevada's request for a preliminary injunction.  Fifteen days after
3  the issuance of this order, PML-Nevada shall not provide loans to
4  any potential borrowers whose LES indicates that they are residents
5  of California.[35]

6  **C.  IRREPARABLE INJURY**

7    "Irreparable harm" for purposes of obtaining a preliminary
8  injury is harm that cannot be redressed by legal or equitable
9  remedy following trial.  Optinrealbig.com, LLC v. Ironport Systems,
10 Inc., 323 F.Supp.2d 1037, 1050 (N.D. Cal. 2004)(citing Public Util.
11 Comm'n v. FERC, 814 F.2d 560, 562 (9th Cir. 1987)).  In the case
12 at bar, both plaintiffs contend that if they are made to comply
13 with the CFLL, they will refrain from continuing to operate in
14 California, causing them to lose customers and revenues.  They also
15 claim that they will suffer damages to their reputation and

16

17 subjecting activities to inconsistent regulations.  See, e.g.,
   Brown-Forman Distillers Corp. v. New York State Liquor Authority,
18 476 U.S. 573, 583-584 (1986); Edgar v. MITE Corp., 457 U.S. 642,
   642 (1982)(plurality opinion of White, J.); Kassel v. Consolidated
19 Freightways Corp., 450 U.S. 662, 671 (1981) (plurality opinion of
   Powell, J.); see Southern Pacific Co. v. Arizona, 325 U.S. 761
20 (1945) (noting the "confusion and difficulty" that would attend the
   "unsatisfied need for uniformity" in setting maximum limits on
21 train lengths).  The court finds that the instant case is
   distinguishable from the types of cases where the Supreme Court has
22 struck down laws for subjecting activities to inconsistent
   regulations because there is no confusion or difficulty in having
23 PML-Nevada look at the LES of its potential borrowers, just as they
   do for their borrowers in the Pioneer program and to refuse loans
24 to those whose LES indicates California residency.

25    [35]  The court has provided PML-Nevada with fifteen (15) days
   to adjust its computer systems and business model in order to
26 comply with this order.

46

1  goodwill with their customers.  Repl. at 6.

2      Damage to a business' loss of customers, loss of business and

3  goodwill is typically an irreparable injury because it is difficult

4  to calculate with reasonable certainty.  Rent-A-Center, Inc. v.

5  Canyon Television and Appliance Rental, Inc., 944 F.2d 597, 603

6  (9th Cir. 1991).  Plaintiffs point out that they cannot recover

7  damages in this case because the Eleventh Amendment will bar

8  recovery of damages in a suit against the State.  Thus, plaintiffs

9  claim that they cannot seek monetary redress if an injunction is

10 not granted.  The court is satisfied that irreparable injury will

11 result if the court does not provide relief for plaintiffs.

12                        **CONCLUSION AND ORDER**

13     Plaintiffs' request for a preliminary injunction is GRANTED

14 in part, and DENIED in part, as consistent with this order.

15     IT IS SO ORDERED.

16     DATED:  July 21, 2006

17                                   LAWRENCE K. KARLTON
18                                   SENIOR JUDGE
                                     UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25

26